UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| |  |
|---|---|
| JACQUELINE LOPEZ,<br>    Plaintiff,<br><br>    v.<br><br>CHUBB & SON, et al.<br>    Defendants. | No. 3:16-cv-00934 (MPS) |

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

**I.    Introduction**

Jacqueline Lopez brings this suit against Chubb & Son ("Chubb"), and Kelly Services, Inc. ("Kelly Services") for discrimination and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"). She claims that Chubb unlawfully terminated her employment after she exercised her rights under the FMLA, and that Kelly Services then refused to place her with another agency. She brings claims against both defendants under the FMLA for interference with the exercise of her rights and discrimination/retaliation. (*See* ECF No. 1 ("Complaint") at 5-7.) Now before me are the defendants' motions for summary judgment. (ECF No. 52; ECF No. 56.) For the reasons that follow, these motions are granted.

**II.    Background**

    **A.    Factual Background**

The following facts, which are taken from the parties' Local Rule 56(a) Statements and the exhibits, are undisputed unless otherwise indicated.[1] Ms. Lopez "was employed by Kelly

---

[1] Although Chubb and Kelly Services filed separate motions for summary judgment, their Local Rule 56(a) Statements overlap significantly due to their similar interests. I therefore

1

Services . . . and assigned to work at Chubb's Simsbury facility as a[n] analyst in the Deductible Tracking Unit ("DTU analyst") from 2011 until March 2015." (ECF No. 58, Kelly Services' Local Rule 56(a)1 Statement ("Kelly's L.R. 56(a)1 Stmt.") at ¶ 1; (ECF No. 72-3 ("Pl.'s Kelly Local Rule 56(a)2 Stmt.") at ¶ 1.) "During all times relevant to [Ms. Lopez's] Complaint, Chubb relied on [Kelly Services] to provide staffing to carry out various responsibilities on an as-needed basis to meet Chubb's fluctuating business needs." (ECF No. 59, Chubb's Local Rule 56(a)1 Statement ("Chubb's L.R. 56(a)1 Stmt.") at ¶ 2); ECF No. 72-2, Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s Chubb L.R. 56(a)2 Stmt.") at ¶ 2.) Although "Chubb could decide to end an assignment at any time, such a decision would not affect the individual's employment with Kelly Services since the individual could be reassigned by Kelly to another client." (Chubb's L.R. 56(a)1 Stmt. at ¶ 10; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 10.)

Ms. Lopez's "assignment as a DTU analyst began in August 2011, with the expectation that [she] would work forty hours each week." (Chubb's L.R. 56(a)1 Stmt. at ¶ 25; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 25.) "Elizabeth Anderton . . . was a DTU supervisor for Chubb" who "supervised [Ms. Lopez] from August 2012 until [Ms. Lopez's] assignment ended in March 2015 . . . ." (Kelly's L.R. 56(a)1 Stmt. at ¶¶ 2, 4; Pl.'s Kelly L.R. 56(a)2 Stmt. at ¶¶ 2, 4.) "Nicole Rankin . . . is employed by Chubb as a Claims Operation Manager and was previously the DTU Senior Supervisor supervising Anderton and the other DTU supervisors." (Kelly's L.R. 56(a)1 Stmt. at ¶ 5; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 5.) "Kerry Bailey was employed by Kelly Services as the representative involved with the Chubb office in Simsbury Connecticut." (Kelly's L.R. 56(a)1 Stmt. at ¶ 14; Pl.'s Kelly L.R. 56(a)2 Stmt. at ¶ 14.) "Once trained, [Ms.

---

draw from both defendants' Local Rule 56(a) Statements, as well as the plaintiff's Local Rule 56(a) Statement, in setting out the factual background to this case. All of the facts listed within are undisputed by Chubb, Kelly Services, and Ms. Lopez unless otherwise noted.

Lopez] was responsible for tracking the status of insurance deductible amounts owed by Chubb's insureds for pending claims." (Chubb's L.R. 56(a)1 Stmt. at ¶ 27; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 27.) "A key function of [Ms. Lopez's] position included providing accurate information on the status of claims and the remaining deductibles owed by the insureds and sending letters to Chubb's insureds about the deductible status." (Chubb's L.R. 56(a)1 Stmt. at ¶ 30; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 30.)

In September of 2013, Ms. Lopez requested and received from Kelly Services "intermittent FMLA leave" from work due to "an evolving medical issue relating to her daughter." (Chubb's L.R. 56(a)1 Stmt. at ¶¶ 34-38; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶¶ 34-38.) "Less than a week after [Ms. Lopez] submitted the necessary paperwork to request intermittent leave to care for her daughter, she also submitted additional documentation to request intermittent FMLA leave to care for her grandfather"; Kelly Services again approved Ms. Lopez's request. (Chubb's L.R. 56(a)1 Stmt. at ¶¶ 42-45; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶¶ 42-45.) Ms. Lopez used these leaves of absence for the next fifteen months without incident; "[e]ach and every time [Ms. Lopez] sought a leave of absence related either to her daughter or her grandfather, the request was granted." (Chubb's L.R. 56(a)1 Stmt. at ¶¶ 45-47; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶¶ 45-47.) "On December 16, 2014, [Ms. Lopez's] grandfather passed away; although Kelly's standard bereavement leave is three days, Nicole Rankin encouraged her to take additional time off and she was out of work for more than two weeks." (Chubb's L.R. 56(a)1 Stmt. at ¶ 49; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 49.) "To the extent that [Ms. Lopez] still required periodic FMLA leave to care for her daughter, she never raised this issue with anyone at Chubb after she returned to work in early January of 2015." (Chubb's L.R. 56(a)1 Stmt. at ¶ 52; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 52.) "No one at Chubb ever said anything to indicate that her

decision to exercise her rights under the FMLA was problematic." (Chubb's L.R. 56(a)1 Stmt. at ¶ 53; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 53.)

"Throughout her assignment at Chubb, [Ms. Lopez] was never considered by Chubb to be a top performer." (Chubb's L.R. 56(a)1 Stmt. at ¶ 54; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 54.) Ms. Lopez received "performance counseling at various points in her assignment" to improve her job performance, including during the period before she requested FMLA leave in 2013; at least initially, she was "able to improve her performance to acceptable levels, including the minimal level required to receive a raise." (Chubb's L.R. 56(a)1 Stmt. at ¶¶ 56-57; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶¶ 56-57.) Ms. Lopez received such counseling from Kelly Services as well in 2014. (Chubb's L.R. 56(a)1 Stmt. at ¶ 58; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶¶ 58.) Ms. Lopez "estimates that she was counseled between five and twelve times in 2014." (Chubb's L.R. 56(a)1 Stmt. at ¶ 60; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 60.)

"In early 2015, Ms. Anderton began to receive complaints from customers and claims adjusters concerning [Ms. Lopez's] work product" concerning "letters sent with incorrect information," and deductible tracking sheets that had not been updated correctly. (Chubb's L.R. 56(a)1 Stmt. at ¶¶ 61-62; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶¶ 61-62.) "After receiving these complaints, Ms. Anderton conducted a QA audit of [Ms. Lopez's] work to see whether the complaints were valid" on March 18, 2015, focusing "on the work that [Ms. Lopez] had performed in the preceding months for the claims examiners who had recently complained about her work product." (Chubb's L.R. 56(a)1 Stmt. at ¶ 63; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 63.) "During this audit, Ms. Anderton observed that approximately 85% to 90% of [Ms. Lopez's] work she reviewed contained errors." (Chubb's L.R. 56(a)1 Stmt. at ¶ 68; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 68.) Ms. Lopez "does not dispute that these errors were made or that she had

4

been repeatedly counseled about these same types of errors in the past." (Chubb's L.R. 56(a)1 Stmt. at ¶ 70; Pl.'s Chubb 56(a)2 L.R. Stmt. at ¶ 70.) "Ms. Anderton had noted similar errors during prior QA audits and had previously set aside time to offer [Ms. Lopez] additional training and feedback on these issues." (Chubb's L.R. 56(a)1 Stmt. at ¶ 71; Pl.'s Chubb L.R. Stmt. at ¶ 71.)

The parties' accounts diverge at this point. The defendants contend that the volume of Ms. Lopez's mistakes was higher than her peers. (*See* Chubb's L.R. 56(a)1 Stmt. at ¶ 76; Kelly's L.R. 56(a)1 Stmt. at ¶ 38.) Ms. Lopez denies this contention generally and avers that other DTU analysts in the office made similar mistakes and received additional training rather than termination, although she does not specifically dispute Chubb's assertions that Ms. Lopez's "situation differed [from that of her peers] due to the sheer volume of mistakes she made" and that "Plaintiff cannot identify any employee who made the same mistakes [Ms. Lopez] did with the same high level frequency." (*See* Pl.'s Chubb L.R. 56(a)1 Stmt. at ¶¶ 75-76; Pl.'s Kelly L.R. 56(a)2 Stmt. at ¶¶ 75-76.) Chubb also contends that Ms. Lopez "refused to accept accountability [for her errors] and reacted [to Ms. Anderton's pointing them out to her] by giving Ms. Anderton a shrug and insisting it was not a big deal." (Chubb's L.R. 56(a)1 Stmt. at ¶ 73.) Ms. Lopez denies this contention and contends instead that she attempted to reach out to Ms. Anderton via instant messaging; she alleges that Ms. Anderton did not get back to her prior to the termination of her tenure with Chubb. (*See* Pl.'s Chubb L.R. 56(a)1 Stmt. at ¶ 73.) Chubb made the decision to end Ms. Lopez's assignment shortly after the QA audit. (*See* Chubb's L.R. 56(a)1 Stmt. at ¶ 77; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 77.)[2]

---

[2] Ms. Lopez denies Chubb's factual assertion but does not point to any evidence contradicting the assertion that Chubb chose to end her assignment shortly after the audit. (*See*

5

"After Kelly was notified of Chubb's decision, a representative of Kelly contacted [Ms. Lopez] to let her know that her assignment had ended . . ., but that Kelly would place her into a different position with a different company." (Chubb's L.R. 56(a)1 Stmt. at ¶ 81; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 81.) Ms. Lopez "estimates she called [Kelly] maybe five times over a three month period and then . . . stopped." (Kelly's L.R. 56(a)1 Stmt. at ¶ 71; Pl.'s Kelly L.R. 56(a)2 Stmt. at ¶ 71.) She claims that each time she called, a representative from Kelly Services informed her that they had no job postings available for her. (Pl.'s Kelly L.R. 56(a)2 Stmt. at ¶¶ 58-59.) Kelly Services claims that "[Ms. Lopez] remains an employee of Kelly Services today but simply has failed to contact Kelly to make the necessary arrangements to secure a new assignment." (Chubb's L.R. 56(a)2 Stmt. at ¶ 84.)

### B. Ms. Lopez's Complaint

Ms. Lopez alleges in her complaint that Chubb terminated her assignment due to her exercise of her rights under the FMLA. (*See* Complaint at ¶¶ 37-39.) She avers that Chubb's excuse for terminating her "was a pretext." (*Id.* at ¶ 38.) She also alleges that "[a]fter being terminated, [she] sought other job placements through defendant Kelly Services," but that "Kelly Services did not place [her] with another employer." (*Id.* at ¶¶ 41-42.) Kelly Services failed to place her, Ms. Lopez alleges, despite the fact that "[p]lacement opportunities . . . were available that [she] was qualified for." (*Id.* at ¶ 43.) Based upon these allegations, Ms. Lopez brings four claims—a claim of "interference with the exercise of rights under the FMLA" against Chubb and Kelly, respectively, and a claim of "FMLA discrimination/retaliation" against each defendant. (*Id.* at ¶¶ 46-63.) In particular, she contends that Chubb violated her rights under the FMLA by

---

Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 77 (averring that Chubb did not communicate with Ms. Lopez between March 18 and the end of her assignment).)

6

terminating her employment and treating her differently from other similarly situated employees. (*Id.* at ¶¶ 48, 52.) She alleges that Kelly violated her rights under the FMLA by terminating her employment, treating her differently from other similarly situated employees, and failing to place her in another job. (*Id.* at ¶¶ 57, 61.)

## III.    Standard of Review

Summary judgment is appropriate only when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014) (internal quotation marks omitted). "A fact is material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). The moving party bears the burden "of showing that no genuine factual dispute exists . . . , and in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences" in favor of the non-moving party. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995).

## IV.    Discussion

"The Second Circuit has recognized two types of FMLA claims—'interference' claims and 'retaliation' claims." *Smith v. Westchester Cty.*, 769 F. Supp. 2d 448, 463 (S.D.N.Y. 2011) (quoting *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004)); *see also* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."); 29 C.F.R. § 825.220(c) ("The [FMLA's] prohibition against interference prohibits an employer from discriminating or

7

retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights."). The Second Circuit has held that both claims arise under the same statutory prohibition against "interference." *Woods v. START Treatment & Recovery Ctrs.*, 864 F.3d 158, 166 (2d Cir. 2017) ("We hold that FMLA retaliation claims [in which an employee claims she was terminated for taking FMLA leave] are grounded in 29 U.S.C. § 2615(a)(1) . . . .").

To set out a "prima facie case on a claim for interference with FMLA rights under 29 U.S.C. § 2615(a)(1), a plaintiff must establish five elements: 1) that she is an eligible employee under the FMLA; 2) that defendant is an employer as defined in FMLA; 3) that she was entitled to leave under FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under FMLA." *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004). A plaintiff may set out a "prima facie claim for retaliation under [29 U.S.C. § 2615(a)(1) by] . . . show[ing] that: '(1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.'" *Drew v. Plaza Const. Corp.*, 688 F. Supp. 2d 270, 277 (S.D.N.Y. 2010) (quoting *Potenza*, 365 F.3d at 168).

### A. Claims Against Chubb

Chubb makes three main arguments against Ms. Lopez's claims. First, it contends that it was not Ms. Lopez's employer for the purposes of the FMLA. (*See* ECF No. 53 at 16.) Second, it argues that Ms. Lopez cannot establish that she was denied benefits to which she was entitled under the FMLA. Third, it argues that she cannot establish that Chubb "ended her assignment

under circumstances permitting a reasonable inference of retaliatory motive." (*See id.* at 23, 26.) Since I agree with the second and third arguments, I do not address the first.

Chubb argues that Ms. Lopez's interference claim fails because she cannot establish that she was denied benefits to which she was entitled under the FMLA. (*See* ECF No. 53 at 23.) It contends that her retaliation claim founders because she cannot establish that Chubb "ended her assignment under circumstances permitting a reasonable inference of retaliatory motive." (*See id.* at 26.) As an initial matter, there is some confusion concerning the difference between Ms. Lopez's "interference" and "retaliation" claims. She asserts both types of claims but the factual allegations underlying them are nearly identical. In her objection, Ms. Lopez avers that she brought both claims to gain the benefit of the Ninth Circuit's decision in *Bachelder v. America West Airlines Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001). (ECF No. 72-1 at 15-16.)

In *Bachelder*, the Ninth Circuit held that a plaintiff advancing an FMLA claim based upon her termination need only prove that her "use of FMLA-protected leave [was] a negative factor in an employment decision" to set out a viable claim. *Bachelder*, 259 F.3d at 1124 (quoting 29 C.F.R. § 825.220 ("[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions . . . .")). The *Bachelder* court based this holding upon language from 29 C.F.R. § 825.220(c), which the court noted "actually pertains to the 'interference with the exercise of rights' section of the [FMLA]." *Id.* The main takeaway from this portion of *Bachelder* and the reason Ms. Lopez wishes to invoke it is the fact that it rejected the use of the more stringent "*McDonnell Douglas*-style shifting burden-of-production analysis" in adjudicating the plaintiff's claim. *See id.* at 1125 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); (ECF No. 72-1 at 14-15 (averring that she pleaded both "interference" and "retaliation/discrimination" causes of action because the "standard of proof differs between the

9

two causes of action"). The Second Circuit has explicitly left open whether *Bachelder* should apply to FMLA claims. *See Graziadio*, 817 F.3d at 429 (noting that it did not decide whether *Bachelder* standard governs FMLA retaliation claims).[3]

I need not decide whether Ms. Lopez's claims should have been brought as an interference or retaliation claim, however, as it would not change the result. Even when I construe Ms. Lopez's claim under the more lenient *Bachelder* standard, she cannot demonstrate that Chubb considered her usage of FMLA leave as a negative factor in its decision to terminate her assignment. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006) ("Regardless of whether [plaintiff] asserts an 'interference' or a 'retaliation' claim, he cannot show that [defendant] considered FMLA leave and request to return a negative factor in its decision to terminate him." (citing *Bachelder*, 259 F.3d at 1126).)[4]

Ms. Lopez has failed to point to any evidence that Chubb considered her use of FMLA leave as a "negative factor" in terminating her employment. As noted above, Ms. Lopez used FMLA leave for a year and a half prior to her termination without incident. She concedes that every leave of absence she requested was granted without incident and that Chubb actually

---

[3] It is worth noting, however, that the Second Circuit recently held that a judge erred in failing to give a jury instruction that a plaintiff advancing an FMLA retaliation claim under 29 U.S.C. § 2615(a)(1) need only prove that her use of FMLA leave was a "negative factor" in an employer's decision to terminate her. *See Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 169 (2d Cir. 2017). In issuing this holding, the *Woods* court rejected the contention that a court should apply a "but for" causation standard in determining whether a party was liable for retaliation. *See id.* at 168. Since the *McDonnell-Douglas* test implies a "but for" causation standard, *see Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 845-46, *Woods* arguably suggests that the *Bachelder* standard should apply to claims brought under 29 U.S.C. § 2615(a)(1) in lieu of the *McDonnell-Douglas* test.

[4] For the avoidance of any doubt, I also find, for the same reasons set forth in the "negative factor" discussion below, that Ms. Lopez has failed to raise a genuine factual dispute about whether Chubb's explanation for the termination was "merely a pretext masking impermissible retaliatory motives." *Sista*, 445 F.3d at 176.

offered her more FMLA leave than she accepted. (*See* Chubb's L.R. 56(a)1 Stmt. at ¶¶ 47-48 (noting that Ms. Lopez "sometimes . . . declined some of Chubb's offers for time off because she preferred to have the income rather than the time off"); Pl.'s Chubb L.R. 56(a)1 Stmt. at ¶¶ 47-48. (admitting these facts).) Further, her use of FMLA leave lessened significantly[5] after her grandfather's passing. To the extent she "still required periodic FMLA leave to care for her daughter, she never raised this issue with anyone at Chubb after she returned to work in early January of 2015."[6] (Chubb's L.R. 56(a)1 Stmt. at ¶ 52; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 52.) Thus, Ms. Lopez's claim rests on the assertion that Chubb decided to terminate her for using FMLA leave after a year and a half of permitting such leave without incident, and after her requirements for such leave had dissipated significantly.

Ms. Lopez points to three main pieces of evidence in defending her claims: (1) the temporal overlap between her use of FMLA leave and her termination; (2) the differential treatment she allegedly received in comparison to other Chubb workers who made similar mistakes and then received retraining; and (3) her purported replacement with someone outside of her protected class. (*See* ECF No. 72-1 at 18-23.) The latter two contentions misrepresent the evidence in the record. Ms. Lopez's assertion that she was replaced with someone outside of her

---

[5] Ms. Lopez testified that the FMLA leave she took to take care of her daughter amounted to roughly an hour each week. (*See* ECF No. 72-5, Pl.'s Ex. 1, Deposition of Jacqueline Lopez ("Pl.'s Lopez Depo.") at 255-56 (Q: "Were you missing time from work when you had to take your daughter to the weekly therapy?" A: "No. I would miss, probably, an hour because I would come in early and leave at 2:00. So, I would just miss an hour from work, which sometimes when she would offer overtime, I would come in to make up some time.").)

[6] This admission is somewhat vague, but there is evidence in the record that Ms. Lopez continued using FMLA leave until she was terminated. (*See* Pl.'s Lopez Depo. at 249 (noting that other Chubb employees knew she was using FMLA leave once a week at the time of her termination).) I therefore conclude that there is at least a genuine issue of material fact concerning whether Ms. Lopez was still using FMLA leave at the time of her termination.

11

protected class appears to rest upon a misinterpretation of Ms. Anderton's deposition testimony. (*See* Pl.'s Chubb L.R. 56(a)2 Stmt., "Disputed Issues of Material Fact" at ¶ 61 ("Plaintiff's replacement did not request FMLA.") (citing ECF No. 72-6, Pl.'s Ex. 2, Deposition of Elizabeth Anderton ("Pl.'s Anderton Depo.") at 48).) The passage in question reads as follows:

> Q: So[] Ms. Lopez is no longer working as a DTU analyst in 2015. What if anything do you do to get another person in there doing that work?
>
> A: Right after she left we wound up delegating the work out among the other DTU analysts.
>
> Q: Did that remain the case up to December of 2016.
>
> A: At that point in time we hired other DTU analysts.
>
> Q: One of those DTU analysts that were hired, that person filled the position Ms. Lopez had?
>
> A: Not directly, no.
>
> Q: Indirectly?
>
> A: Indirectly, yes.
>
> Q: Do you know if that person ever missed time from work due to a sick child?
>
> A: No.
>
> Q: Do you know if that person ever requested FMLA?
>
> A: No.

(Anderton Depo. at 48-49.) As the passage above demonstrates, Ms. Anderton testified that Ms. Lopez was not initially replaced but that her responsibilities were divided among others. This alone undermines the value of this piece of evidence in establishing that Chubb held Ms. Lopez's use of FMLA leave against her. See *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 505 (S.D.N.Y. 2012) (holding that divvying up of responsibilities previously held by plaintiff bringing age discrimination amongst younger workers did not give rise to inference of

12

discrimination). In any event, Ms. Anderton also testified that she had no idea whether the worker(s) who "indirectly" "filled" Ms. Lopez's position requested or required FMLA leave. Thus, Ms. Lopez has not provided any evidence that the worker(s) who replaced her sought or needed FMLA leave

Ms. Lopez's reliance upon Chubb's allegedly more favorable treatment of her peers is also unavailing. Her assertion that other DTU analysts made the same mistakes she did but received additional training instead of termination rests upon the deposition testimony of Ms. Anderton, Ms. Rankin, and Ms. Lopez herself. (*See* ECF No. 72-1 at 7-8 (citing Pl.'s Lopez Depo. at 252-54; Pl.'s Anderton Depo. at 56; ECF No. 72-7, Pl.'s Ex. 3, Deposition of Nicole Rankin ("Rankin Depo.") at 41).) In her testimony, Ms. Lopez claimed that other Chubb staffers had made one of the mistakes she made—failing to attach the deductible tracking chart to the claim—but had not received a reprimand. (*See* Pl.'s Lopez Depo. at 252-54.) Ms. Anderton testified that to the best of her knowledge, other DTU analysts had also forgotten to attach the deductible chart to outgoing letters, and that Chubb had provided additional training to some DTU analysts for such mistakes in the past. (*See* Pl.'s Anderton Depo. at 56-57.) Ms. Rankin testified that at least some other individuals in the Chubb office had received additional training after failing to attach deductible tracking charts to claims. (*See* Rankin Depo. at 41 (Q: "Were there other DTU analysts under your supervision directly or indirectly who were failing to attach the deductible tracking chart to a claim?" A: "I'm sure there were." Q: "Do you know if any of those individuals received additional training to address the failure to attach a deductible tracking chart to the claim?" A: "If it was brought to our attention I'm sure we did, yes.").)

Even when her claim that other DTU analysts also neglected to attach deductible tracking charts to claims is credited, however, Ms. Lopez has failed to establish that she was treated

13

differently than her peers. Ms. Lopez conceded that approximately eighty-five to ninety percent of the work Ms. Anderton reviewed in her audit in early 2015 contained errors. (*See* Chubb's L.R. 56(a)1 Stmt. at ¶ 68; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 68.) She admitted that the errors included the following: (1) "sen[ding] approvals to insureds prior to obtaining approval by the claims examiner as required"; (2) "fail[ing] to modify letters to insureds to reflect that no payment was due'" (3) "fail[ing] to send approval letters to insureds in the correct order"; (4) "incorrectly calculat[ing] the deductibles owed by customers"; and (5) "fail[ing] to attach a deductible tracking chart to 208 of the 245 claims she processed in the preceding three months." (*See* Chubb's L.R. 56(a)1 Stmt. at ¶ 69; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 69.) Ms. Lopez also conceded that "she had been repeatedly counseled about these same types of errors in the past." (*See* Chubb's L.R. 56(a)1 Stmt. at ¶ 70; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 70.) The plaintiff has not pointed to any proof suggesting that any other Chubb employees committed the same errors that she did, received the same repeated counseling that she had, and remained employed at Chubb.[7] *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999) (holding that in order for a plaintiff to demonstrate differential treatment from other employees giving rise to an inference of discrimination, "they must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the

---

[7] Ms. Lopez contends that it was Chubb's policy to provide additional training to employees who committed errors. (*See* ECF No. 72-1 at 21-22.) She conceded, however, that she had received counseling between five and twelve times for such errors in 2014 alone. (*See* Chubb's L.R. 56(a)1 Stmt. at ¶ 60; Pl.'s Chubb L.R. 56(a)2 Stmt. at ¶ 60.) Ms. Anderton testified that the reason Ms. Lopez was terminated, as opposed to receiving further training, was because she had received such counseling in the past. (*See* ECF No. 55, Deposition of Elizabeth Anderton ("Chubb's Anderton Depo.") at 63 (Q: "So why didn't you set aside additional time after the QA [audit] in 2015 to go over the items that [Ms. Lopez] had made mistakes on?" A: "I felt that I had trained her, provided the most training that I could at that point.").) Ms. Lopez has failed to point to any evidence in the record indicating that it was Chubb's policy to provide additional training to employees who continually repeated the same mistakes.

plaintiff's . . . ." (internal quotation marks omitted)); *Sweeney v. Leone*, No. 3:05CV871 PCD, 2006 WL 2246372, at *13 (D. Conn. July 31, 2006) (concluding in equal protection context that plaintiff had failed to demonstrate he was treated differently from other similarly situated employees because he "failed to produce any evidence showing that other employees engaged in misconduct of comparable seriousness").

"[I]t is well-settled that an employer is not liable for 'interfering' with an employee's leave when the employee would have been terminated regardless of the leave." *Hill v. New York City Hous. Auth.*, 220 F. Supp. 3d 499, 506 (S.D.N.Y. 2016) (quoting *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 162 (S.D.N.Y. 2011)). The "FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 429 (S.D.N.Y. 2004) (internal quotation marks omitted).

Finally, the purported temporal overlap between Ms. Lopez's usage of FMLA leave and her termination also does not help her case given the fact that Chubb approved her use of FMLA leave for the year and a half before her termination without incident. Courts have held that any inference of discrimination raised by temporal proximity is undercut by an employer's prior approval of numerous FMLA leave requests without incident. *See, e.g.*, *Henson v. U.S. Foodservice*, No. CIV. 11-1809 JBS/KMW, 2013 WL 6080359, at *8 (D.N.J. Nov. 19, 2013) ("Plaintiff has been using FMLA leave intermittently since 2004 without any adverse employment impacts, and the court is persuaded by evidence of Defendant's history of approving the Plaintiff's . . . FMLA leave that it did not act with discriminatory motive in firing the Plaintiff." (internal quotation marks omitted)); *Pruitt v. Peninsula Reg'l Med. Ctr.*, No. CIV.A. GLR-14-344, 2014 WL 2916863, at *5 (D. Md. June 25, 2014) ("[Defendant's] approval of

[Plaintiff's] prior FMLA requests further strengthens its argument that [Plaintiff] was discharged for a legitimate reason."). The fact that Ms. Lopez began using *less* FMLA leave after the passing of her grandfather in late 2014 further undermines any inference that could be drawn based upon the temporal proximity between Ms. Lopez's termination and her ongoing use of FMLA leave.

For these reasons, I grant Chubb's motion for summary judgment.

**B.     Claims Against Kelly Services**

Ms. Lopez's claims against Kelly Services appear to rest almost entirely on her contention that the company retaliated against her following her use of her FMLA leave rights by failing to provide her with another job posting after the end of her assignment at Chubb. (*See* ECF No. 72-1 at 24-25.) Nonetheless, for the sake of completeness, I note that my analysis above forecloses any claim against Kelly Services relating to Ms. Lopez's termination from her assignment at Chubb. To the extent that it does not, Ms. Lopez has failed to point to any evidence demonstrating that Kelly Services played any meaningful role in her termination. Indeed, she admitted that "Chubb determined the length of [her] assignment." (*See* Kelly's L.R. 56(a)1 Stmt. at ¶ 17; Pl.'s Kelly L.R. 56(a)2 Stmt. at ¶ 17.) Further, the record is bereft of any evidence that Kelly Services played any part in Ms. Lopez's termination at Chubb, other than to convey notice of the termination to her. *See Lima v. Addeco*, 634 F. Supp. 2d 394, 402 (S.D.N.Y. 2009) (granting summary judgment on plaintiff's discrimination claim against employment agency in part on basis that plaintiff had "not provided any evidence linking [employment agency defendant] in any way with the adverse employment decision").

That leaves the question of whether Kelly Services retaliated against Ms. Lopez by failing to promptly provide her with another assignment. Since Ms. Lopez has also brought

16

interference and retaliation claims against Kelly Services, I again apply the "negative factor" standard noted above—i.e., I inquire into whether Kelly Services relied upon Ms. Lopez's use of FMLA leave as a "negative factor" in failing to provide her with another assignment. *See Sista* 445 F.3d at 176. Ms. Lopez relies on her deposition testimony to support her claims against Kelly Services. She testified that after her termination at Chubb, a Kelly Services employee instructed her to "reach out to Kelly Services to look for new employment opportunities." (*See* Pl.'s Lopez Depo. at 266.) Ms. Lopez testified that she called a nearby Kelly Services branch three weeks later to inquire, but was informed the company had no job postings available at that time. (*See id.* ("[A]bout three weeks later, I called the local branch [of Kelly Services], asked if they had any job postings for me. They put me on hold, and they came back and said they didn't have nothing available.").) Ms. Lopez "estimates she called [Kelly] maybe five times over a three month period and then . . . stopped." (Kelly's L.R. 56(a)1 Stmt. at ¶ 71; Pl.'s Kelly L.R. 56(a)2 Stmt. at ¶ 71.)

This evidence does not support the contention that Kelly Services relied upon Ms. Lopez's use of FMLA leave as a "negative factor" in failing to place her in a new posting. It does not shed any light on Kelly Services' decision whatsoever. Based upon the evidence Ms. Lopez has presented, it is just as likely that Kelly Services did not provide her a position in the three months during which she inquired because it had no open positions.[8] Ms. Lopez asks the Court to draw an inference based upon nothing more than pure conjecture that Kelly Services failed to place her in another position based upon her use of FMLA leave. This is not enough.

---

[8] Although Ms. Lopez alleged in her complaint that Kelly Services failed to offer her another placement despite the fact that placements "were available that plaintiff was qualified for" (*see* Complaint at ¶ 43), she does not point to any evidence in the record supporting this contention.

*See Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996) ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.").[9]

I therefore grant Kelly Services' motion for summary judgment.

**V.     Conclusion**

For the reasons set forth above, the motions for summary judgment brought by Chubb and Kelly Services (ECF No. 52; ECF No. 56) are GRANTED.  The Clerk is directed to enter judgment in favor of Chubb and to close this case.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                September 4, 2018

---

[9] Any inference that Kelly Services considered Ms. Lopez's use of FMLA leave as a "negative factor" is further undercut by the fact that it was a Kelly Services employee that suggested that Ms. Lopez use FMLA leave in the first place. (*See* Kelly's L.R. 56(a)1 Stmt. at ¶ 72 ("[Ms. Lopez] testified that she did not request FMLA leave initially but that Kelly employee Kerry Bailey brought it to her attention to protect her assignment from ending."); Pl.'s Kelly 56(a)2 Stmt. at ¶ 72 (admitting this fact).)

18